# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

ROBERT STEWART                         CIVIL ACTION NO. 06-cv-2354

VERSUS                                 JUDGE STAGG

WARDEN LOUISIANA STATE                 MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

### Introduction

A Red River Parish grand jury indicted Robert Stewart ("Petitioner") of the first-degree murder of Wendi Long. Petitioner, after confessing to shooting Long, entered a plea of guilty to first-degree murder (without capital punishment) and reserved his right to appeal the denial of a motion to suppress his statements to investigators. The state appellate court affirmed the conviction on direct appeal, holding that Petitioner's statements were free and voluntary. State v. Stewart, 862 So.2d 1100 (La. App. 2d Cir. 2003), writ denied, 876 So.2d 74 (La. 2004). Petitioner then pursued a post-conviction application in state court. He now seeks federal habeas corpus relief with respect to several issues presented in the post-conviction application. It is recommended, for the reasons that follow, that the petition be denied.

### Foundation for Guilty Plea

#### A. Petitioner's Attacks on His Plea

Louisiana law permits a conviction for first degree murder if the defendant acted with specific intent to kill or to inflict great bodily harm and he is engaged in the perpetration or

attempted perpetration of certain enumerated felonies, including aggravated rape and forcible rape. La.R.S. 14:30. Petitioner's first claim is that the court failed to set forth the precise enumerated felony at issue and did not establish a factual basis to demonstrate specific intent. Petitioner also invokes <u>Boykin v. Alabama</u>, 89 S.Ct. 1709 (1969) in this rather broad attack on his guilty plea.

**B. The Plea Hearing**

Petitioner was represented at his guilty plea hearing by defense attorneys Richard Goorley, Marty Stroud, and Joe Cage, who have decades of experience among them as both prosecutors and defense counsel. Petitioner stated that he had discussed his case with each of them and was satisfied with his representation. The trial judge then explained the right to trial by jury, the right to confront accusers, the right to call witnesses for the defense, the right against self-incrimination, and other matters generally included in a <u>Boykin</u> colloquy. Petitioner stated that he understood his rights and that he was waiving them by pleading guilty. The judge then described the charged crime:

> Q  I am now going to make sure that you understand the nature of the charge against you. You are charged with the crime of first-degree murder. I will now read the statute defining the above crime. "Louisiana Revised Statute 14:30. First-degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm, and is engaged in the perpetration, or attempted perpetration of aggravated kidnapping, second-degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting,

first-degree robbery or simple robbery." Did you hear me read the statute, Mr. Stewart?

A    Yes, sir.

Q    Were you involved in any one of the above enumerated felonies?

A    Yes, sir.

Q    Do you understand the nature of this charge?

A    Yes, sir.

Tr. 624-25.

The judge then called on the prosecutor to present a brief summary of the evidence. The district attorney described the facts, generally as follows: The victim, Wendi Long, and two friends drove to Shreveport in Wendi's car. They stopped to see Petitioner at his place of employment, Shane's Acadiana Crawfish. After Petitioner got off work, Wendi and her friends went by Petitioner's house so that he could change clothes and join them. While at the house, Petitioner showed Wendi and her two friends a .25 caliber Colt semi-automatic pistol with a broken handle.

The four of them left in Wendi's car and went to an apartment in Shreveport to visit other friends. Petitioner got ready to leave before the others, and the two friends used Wendi's car to drive Petitioner back to his house. Petitioner later got in his truck and returned to the apartment gathering. He told Wendi that her two friends had returned to Natchitoches in her car (they were actually in Bossier getting something to eat), but that he

would give her a ride back to Natchitoches. Wendi got in Petitioner's truck, and that was the last time anyone other than Petitioner saw her alive.

Petitioner drove toward Natchitoches on Highway 1, but stopped between Westdale and Highway 509. He shot Wendi twice in the head with the .25 caliber Colt pistol. The district attorney mentioned at this point that Petitioner "was engaged in one of the felonies enumerated" in the first-degree murder statute. He did not go into detail, but said Petitioner had confessed to having "rough sex" with the victim and using a knife to cut off her underwear. The prosecutor states in his memorandum that he refrained from going into greater detail because Louisiana law does not require a factual basis to support a guilty plea[1], and the victim's family was present in the courtroom.

When Wendi's friend came looking for her the next day, Petitioner first said Wendi had left the apartment with Jeff Dennis. Mr. Dennis explained that it was Petitioner who left with Wendi. Petitioner then claimed that Wendi had left him in the company of two men named Mike and Zant, who were in a black pickup truck. Wendi remained missing from April to October of 2001.

Petitioner (who was jailed months later on unrelated forgery charges) revealed to an investigator the location of Wendi's body, and the body was recovered at the exact location revealed by Petitioner. Petitioner later gave statements to investigators that implicated

---

[1] See State v. Kennedy, 974 So.2d 203 (La. App. 2d Cir. 2008) ("Louisiana law, unlike [federal law] has no statutory provision requiring accompaniment of a guilty plea by the recitation of a factual basis.").

himself in the crime. A woman who lived near the crime scene gave investigators a .25 caliber Colt pistol that her nephew found. The pistol had a broken handle, and a bullet found in Wendi's skull was a .25 caliber that a firearms expert testified was fired from either a Colt or Astra .25 caliber pistol. Petitioner identified a photograph of the gun as the one that he threw out of his truck after killing Wendi and leaving her body. The two friends who were with Petitioner and Wendi the night she was killed also identified the pistol as the one Petitioner had shown them hours before the murder. Petitioner made other incriminating statements to investigators.

The trial judge asked Petitioner if the facts stated by the district attorney were correct, and Petitioner agreed that they were. He also agreed that he fully understood the reason the State brought the first-degree murder charge against him. Tr. 625-27.

Petitioner told the judge that he was pleading guilty because he was, in fact, guilty. Defense counsel represented that they had advised Petitioner of the nature of the charge and related matters, and they were convinced that he understood what they explained. Tr. 629. Petitioner also signed a document titled "Determination of Understanding of Constitutional Rights, Nature of Charges, and Consequences of Guilty Plea." The document set forth the elements of first-degree murder. Petitioner wrote "yes" to indicate that he fully understood the reasons the State brought the charge against him. Each of the three defense counsel signed a representation that counsel was present during the plea colloquy and had informed

Petitioner "of his rights, particularly the nature of the crime for which he was originally charged and the crime to which he has pled guilty."  Tr. 604-09.

## C. Federal Standard of Review

A federal court shall not grant habeas relief with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).  Relief is not permitted under the "unreasonable application" standard unless the state court decision was so wrong as to be objectively unreasonable.  Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

## D. The State Court Decision

Petitioner first presented this issue in his post-conviction application.  The trial court wrote only a brief decision that, "considering the answer filed by the State and being of the opinion that the factual and legal issues can be resolved based on the record," the application was denied without further proceedings.  Tr. 663.  The state appellate court denied a writ application without much more analysis.  It wrote that the record "supports the trial court's denial of the applicant's several claims involving the issues of the voluntariness of the guilty

plea and ineffective assistance of counsel." It added that Petitioner had "failed to meet his burden of proving that relief should be granted," so the "writ is denied on the showing made." Tr. 667. The Supreme Court of Louisiana denied writs without comment. Tr. 778.

**E. Analysis**

The court takes seriously its obligation to defer to the state court's decisions in such matters, but when the state court offers essentially no explanation for its actions, it makes it difficult to afford that deference. The court must, despite the absence of any actual opinion, nonetheless defer to the state court's ultimate decision of the issue. Neal, 286 F.3d at 246.

Petitioner's attack on his guilty plea is somewhat scattered. He invokes Boykin v. Alabama, 89 S.Ct. 1709 (1969), but the record shows that the trial judge clearly advised Petitioner of his rights as required by that decision: the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers. Furthermore, a specific express articulation and waiver of the three rights mentioned in Boykin is not mandated. The guilty plea will stand if the record shows that the plea was voluntarily and intelligently given. Neyland v. Blackburn, 785 F.2d 1283, 1287 (5th Cir.1986); Island v. Louisiana, 2006 WL 3772283, *2 (W.D. La. 2006). The record discussed above is more than adequate to make such a showing. The court advised Petitioner of the nature of the crime and his legal rights, and the court obtained representations from Petitioner and his counsel that they had conferred to Petitioner's satisfaction about all such matters.

Petitioner also complains that there was not an adequate factual basis to support his plea, but the Constitution does not obligate state courts, except in the context of an <u>Alford</u> plea, to establish a factual basis for a guilty plea. <u>Matthew v. Johnson</u>, 201 F.3d 353 (5th Cir. 2000); <u>Smith v. McCotter</u>, 786 F.2d 697, 702 (5th Cir. 1986). Petitioner admitted his guilt, and the prosecutor went beyond the requirements of state law and did articulate facts that supported the crime to which Petitioner pleaded guilty. No relief is permitted on this claim.

Petitioner next complains that the judge did not specify the enumerated felony at issue. A guilty plea is not voluntary unless the defendant has "real notice of the true nature of the charge against him." <u>Henderson v. Morgan</u>, 96 S.Ct. 2253, 2257 (1976). If the record shows that defense counsel has explained the nature of the offense to the accused, then even failure of the trial judge to describe the elements of the offense would not make the plea involuntary. <u>Id</u>. at 2258. The record and applicable law, discussed below, show that this claim lacks merit.

Petitioner admitted at the plea hearing that he was involved in one of the felonies listed in the first degree murder statute. Petitioner had earlier admitted to police that he engaged in sex with the victim minutes before the murder, and Petitioner was quoted in a mental examination report as saying, "They say that I killed somebody and that I raped her." Tr. 7(ii). Counsel represented that Petitioner had been advised of the nature of the charge.

In <u>Bonvillain v. Blackburn</u>, 780 F.2d 1248 (5th Cir. 1986), the petitioner was not expressly informed of the elements of forcible rape at his guilty plea hearing, but his defense

counsel had stated on the guilty plea form that he had informed the defendant of his rights, including the nature of the crime to which he was pleading guilty. The Fifth Circuit held that the guilty plea form was prima facie evidence that Petitioner was informed of the elements of forcible rape. There was no contrary evidence, so the claim was denied. A similar challenge to a second-degree murder guilty plea was rejected on habeas review in Theriot v. Whitley, 18 F.3d 311 (5th Cir. 1994) when the guilty plea form contained a general representation that the defendant had been informed and understood the charge to which he was pleading guilty.

Petitioner in this case signed a detailed plea form that set forth the elements of first-degree murder, he represented in open court that his three attorneys had fully advised him of the nature of the crime to which he was pleading guilty, and Petitioner admitted in court that he was engaged in one of the enumerated felonies when he committed the murder. Under these circumstances, Petitioner has not demonstrated that the state court's decision that his plea was voluntary was so incorrect as to be an objectively unreasonable application of clearly established Supreme Court precedent. Accordingly, habeas relief is not permitted with respect to this claim.

**Mental Capacity**

Petitioner argues that trial counsel was ineffective for not requesting a mental evaluation regarding Petitioner's ability to understand the case and assist his counsel. He makes a related argument that the trial judge erred in allowing him to plead guilty despite

concerns about Petitioner's mental capacity. Petitioner cites no factual basis for this argument in his federal petition, and the evidence the court has reviewed in the state court record reveals no such basis.

Petitioner initially entered a plea of not guilty and not guilty by reason of insanity. The trial judge appointed psychiatrists Dr. Paul Ware and Dr. George Seiden to examine Petitioner regarding his mental condition at the time of the alleged crime. Tr. 3. The reports also address, however, Petitioner's general mental health and capacity. Dr. Seiden recorded that Petitioner denied any history of psychiatric illness or treatment. Petitioner said that he dropped out of school at age 16 after completing the eighth grade, having repeated the second and seventh grades. He said his main problem was talking back to teachers and other conduct problems. He then worked in the Job Corps, and he was employed at a restaurant the time of the crime. The mental status examination conducted by Dr. Seiden revealed no unusual findings or concerns about Petitioner's capacity. Tr. 7. Dr. Ware issued a similar report, which included the finding that Petitioner had serious problems with substance abuse but "is certainly mentally competent to understand the charges against him and assist counsel in his defense." Tr. 8-13. The insanity plea was later withdrawn. Tr. 478-79.

Petitioner has not presented or pointed to any evidence in the record to suggest that he actually lacked the capacity to understand the proceedings against him or to assist in his defense. There is absolutely no basis to find that the state court's rejection of these issues on post-conviction review was an objectively unreasonable application of clearly established

Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented. This is a purely speculative and conclusory claim that does not warrant further proceedings. See U.S. v. Edwards, 442 F.3d 258, 268 n.10 (5th Cir. 2006) (collecting § 2254 and § 2255 cases regarding summary dismissal of such claims).

**Ineffective Assistance of Counsel**

### A. The Statements to Detective Hall

Petitioner argues that Laura Johnson, who originally represented him, rendered ineffective assistance of counsel when she "encouraged" him to give incriminating statements to police. Petitioner began talking to police before he was in custody and before Attorney Johnson represented him. Petitioner talked to investigators about the night Wendi disappeared, and he shared his story that he left Wendi in the company of two men named Mike and Zant. The state police subjected Petitioner to a multi-hour polygraph examination, and it indicated that he was telling the truth. Tr. 339-43. Petitioner was placed under hypnosis for three hours to help him remember details about Mike and Zant. A Red River Parish detective was quoted in the newspaper as saying, "We believe he is telling the truth." Tr. 219. Several months later, Petitioner was jailed in Natchitoches Parish on unrelated forgery charges. Natchitoches detective Danny Hall interviewed Petitioner for the first time on October 23, 2001. Petitioner did not make any incriminating statements. He merely agreed to help in finding Mike and Zant.

Petitioner did not attack that statement to Hall, but he filed a motion to suppress statements that he made later. Detective Hall testified at a hearing on the motion that Petitioner called from the detention center and asked for another meeting on November 8, 2001. Hall knew that local attorney Laura Johnson represented Petitioner on the unrelated Natchitoches Parish charges. Hall did not feel comfortable talking to Petitioner without notifying the attorney, so he advised her of Petitioner's request. Johnson accompanied Petitioner to the interview at the district attorney's office. Petitioner told Hall that he had received a telephone call and knew where Wendi's body could be found. Petitioner gave details about a location, which police used to find the body.

Detective Hall testified (Tr. 355-74) that Petitioner requested another meeting on November 16, 2001. Attorney Laura Johnson once again accompanied Petitioner. Johnson made no significant comments on the record of the transcribed statement other than to note her presence. Petitioner said that he was giving the statement because he had, since his arrest, asked Christ to enter his life and he wanted to confess his sins as directed by the Bible so he could move forward with his spiritual life. He said "the right thing to do for me to enter into the Kingdom of Heaven is to let the whole truth come out ..." Petitioner then gave a statement in which he said he followed Mike and Zant as they drove South on Highway 1 with Wendi. He claimed that the group stopped on a side road, they snorted crystal methamphetamine, and all three men had sex with Wendi. At some point, Mike and Petitioner got out their respective pistols and started shooting across the railroad tracks, just

because they were high. Wendi walked in front of the shooters, and one of Petitioner's shots hit her in the head. Petitioner said that the two other men "freaked out and left," and he also left a few minutes later. He said he threw his pistol out the window about 15 miles from the scene. A transcript of the statement appears at Tr. 69-102.

Detective Hall testified that Petitioner initiated another interview on November 20, 2001. Attorney Laura Johnson, as well Red River Parish deputy Tracy Scott, were present. Johnson made no significant comment on the record of the transcribed statement. Petitioner identified two photographs of the gun he had thrown from his truck. Tr. 104-08.

Petitioner met with Detective Hall again on December 4, 2001. Attorney Laura Johnson was present for the interview. She made no significant comment on the record of the transcribed statement. Petitioner said the reason for the meeting was that he wanted to "[g]o ahead and just tell you the truth about what had happened" because "[i]t's been killing me on the inside and I've lied to you about that." Petitioner admitted that he had made up Mike and Zant. He said that he was driving Wendi to Natchitoches, with both of them snorting crystal, when he stopped on the side of the road so that he could use the restroom. While stopped, they used more drugs and had sex. Petitioner said Wendi "asked me to you know kind of be rough with her," so he used his pocket knife to cut off her thong panties. After they had sex, they used more drugs and got dressed. They soon argued about how poorly Wendi's boyfriend treated her, and Petitioner insisted that he "would treat her with respect and I would just be a good guy for her ...." Wendi slapped Petitioner during the

argument. Petitioner said that "when she slapped me, I just, I don't know, I flipped out and I shot her" in the back of the head. Petitioner said that he then "walked up and I shot her again in the head again a second time." Petitioner said he carried the gun because "I mean you know it's rough in Shreveport." Petitioner said he dragged Wendi's body a short distance into some brush. He also removed Wendi's boots and jeans, which were a light color that he feared could be seen from the highway, and he threw them out elsewhere. Tr. 109-24. <u>See</u> also state court appellate opinion at Tr. 562-65.

Attorney Laura Johnson testified at the suppression hearing that she was appointed to represent Petitioner on forgery charges in August 2001. Petitioner's mother later retained Johnson to represent Petitioner in connection with the Wendi Long investigation. She tendered an initial fee of $1.00. (Johnson later withdrew from the case, stating that she never received any additional payment. Tr. 473-74.) Johnson was not representing Petitioner in connection with the Long matter when Detective Hall first met with Petitioner in October. She was, however, representing Petitioner during the other interviews described above.

Ms. Johnson testified that she had been practicing law for 22 years. The bulk of her practice was criminal defense, and she estimated that she had tried 50 jury trials as first chair. She had never defended a capital case, but she had defended a manslaughter charge. Her assessment of the case, based on initial discussions with Petitioner, was that the death penalty was not likely.

Johnson testified that she discussed with Petitioner the various possible charges and penalties, ranging from manslaughter to murder and the possibility of the death penalty. She said that there were no plea discussions, sentencing limitation negotiations, or immunity requests made before Petitioner gave his several statements to Hall. She testified that she consulted with Petitioner at every step of these events, and she met with him and had discussions prior to the interviews with Detective Hall. She refused to reveal the contents of their conversations, however, citing attorney-client privilege. She did agree that Petitioner had told her, prior to giving his last (and most incriminating) statement, that he had found religion and wanted to atone for the things he had done. She also agreed that it was Petitioner's desire to give all of the statements he made to Detective Hall. Tr. 416-44.

The trial judge found that the statements were made voluntarily and denied the motion to suppress. The defense team later returned with additional evidence. The judge did not reopen his decision, but he allowed the defense to proffer the testimony of Rebecca Hudsmith, the Federal Public Defender for the Middle and Western Districts of Louisiana. Hudsmith was proffered as an expert in assessing and analyzing the reasonableness of counsel's performance in capital cases. She first offered the legal opinion that the voluntariness of a confession turns, in part, on the nature and type of advice that the person's attorney gave. She opined that counsel has a duty to ensure, before a defendant makes incriminating statements, that the statements are immunized from use against the defendant or that a favorable plea agreement has been entered. She said she could not imagine a capital

case in which an attorney could effectively represent a client without seeking to secure some sort of benefit before the client, in effect, made the State's case by confessing to the crime.

Hudsmith conceded that the transcripts of the statements showed that Petitioner wanted to make the statements to the police, but she urged that counsel still had a duty to approach the prosecutor and try to secure some form of advantage to her client in exchange for the statements. One potential benefit might be removing the possibility of the death penalty.

Hudsmith conceded on cross-examination that the lawyer ultimately could not stop a client from making a statement if the client wished to do so. The same is true with the client's choice to testify at trial, even if the lawyer thinks it is a terrible mistake. She countered that the attorney should fully advise the client about the risks when the client insists on taking such a step. Tr. 488-504.

## B. Ineffective Assistance of Counsel; Habeas Review

In the ordinary habeas case where there has been a trial and conviction, a petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the

error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. 104 S.Ct. at 2068.

The two-part test also applies to challenges to guilty pleas based on ineffective assistance of counsel, but the prejudice analysis is modified to focus on whether counsel's ineffective performance affected the outcome of the plea process. The petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 106 S.Ct. 366, 370 (1985).

The test for habeas purposes is not whether Petitioner made the showing required under Strickland or Hill. The test is whether the State court's decision – that Petitioner did not make the showing – was not only wrong but so incorrect as to be contrary to, or an objectively unreasonable application of, the standards provided by Strickland and Hill's clearly established federal law. Wiggins v. Smith, 123 S.Ct. 2527, 2535 (2003); Williams v. Taylor, 120 S.Ct. 1495 (2000); Henderson v. Quarterman, 460 F.3d 654, 665 (5th Cir. 2006).

## C. Performance Prong

With respect to the performance prong, there is a presumption that counsel's performance is constitutionally effective and based on sound strategic decision, and the burden is on Petitioner to show otherwise. Strickland, 104 S.Ct. 2065. Attorney Johnson testified that she consulted with her client throughout the time during which he made statements to Detective Hall. She does not reveal the contents of their consultations, but they

did occur. There is also evidence that Petitioner initiated each meeting and, based on a recent religious conversion and desire to confess the truth, especially desired to make more incriminating statements. Johnson did not seek any legal advantage from the prosecuting authorities in exchange for these statements, but perhaps she was optimistic that Petitioner's cooperation would earn him some degree of leniency. It may be that Johnson strongly opposed Petitioner giving the statements, and that Petitioner insisted upon doing so, which would be his prerogative. The record does not permit specific findings on these issues, nor does it reflect Johnson's thought process with any degree of precision. We do know, however, that there was consultation between counsel and client about giving the statements.

Petitioner's post-conviction application filed in state court provided few if any facts to address Petitioner's burden to overcome the presumption that counsel acted reasonably. He alleged that "his incompetent attorney Laura Johnson was present" when he made his statements, and that Attorney Johnson was "unqualified ... because she had never before worked on a death penalty case." Tr. 597. He also made a conclusory assertion that Johnson "advised him to make statements against his penal interest." Tr. 599. Petitioner did not present an affidavit or even articulate any particular facts in his state-court application that would support the generic assertion that Johnson advised him to make the admissions. His federal petition is similarly short on facts in this regard. He states in a heading for this issue that Johnson "encouraged her client to give incriminating statements against his penal

interest." The text of the memorandum on this issue merely adds that counsel "erroneously advised [Petitioner] to make statements against his interest." No supporting facts are offered.

Under these circumstances – evidence of pre-statement consultations, evidence that Petitioner was clear that he wanted to make each statement, a presumption of effective assistance, and only an unsworn and conclusory assertion that counsel encouraged the statements – the undersigned cannot find that the state court's decisions with regard to the performance prong was an objectively unreasonable application of <u>Strickland</u> to the facts before it.

### D. No Basis for A Hearing

A federal evidentiary hearing, which is held only in limited circumstances, is inappropriate in this case because Petitioner has not exhibited reasonable diligence in developing the factual record in state court. <u>See</u> 28 U.S.C. § 2254(e)(2). He made a general request for an evidentiary hearing in state court, in the alternative to an immediate grant of relief, but he did not articulate any of the facts that he might present at such a hearing. Tr. 603. "Mere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his claim." <u>Dowthitt v. Johnson</u>, 230 F.3d 733, 758 (5th Cir. 2000). The Fifth Circuit faulted Mr. Dowthitt for not presenting supporting affidavits or showing that affidavits could not be obtained absent a discovery order.

The key witnesses with respect to Petitioner's ineffective assistance claim are Attorney Johnson and Petitioner. Petitioner could have easily presented his own affidavit to

the state court or, at a minimum, set forth in his state-court memorandum the facts that he could testify to in support of his claim. And Petitioner made no representation in his state court filing regarding any efforts to obtain an affidavit or other statement from Attorney Johnson about the substance of her advice to him. He chose instead to rely on mere conclusory assertions on the critical issue.

The Fifth Circuit affirmed the denial of a Louisiana prisoner's petition for habeas relief in <u>Burton v. Terrell</u>, 2009 WL 2152623 (5th Cir. 2009), which presented an ineffective assistance claim that counsel did not advise the petitioner of the maximum penalty before he entered a guilty plea. The Court found that a federal hearing was not proper because the petitioner "was not diligent in developing the factual record–whether or not he requested an evidentiary hearing from the state court–because he neither claimed nor demonstrated that his trial counsel's all-important affidavit 'could not be obtained absent an order for discovery or a hearing.'" <u>Id</u>. at *4, quoting <u>Dowthitt</u>. The prisoner had "instead relied solely on conclusory arguments just as he later did in seeking federal relief ...." <u>Id</u>. Those remarks, and the conclusion that a federal hearing is not warranted, apply with equal force in this similar case.

**E. Prejudice Prong**

Assuming Attorney Johnson's performance was constitutionally ineffective, Petitioner must still show prejudice. The typical prejudice argument in a guilty plea case is that counsel who represented the petitioner at the time the plea was entered gave him poor advice or

representation regarding the decision to plead guilty. In this case, however, Petitioner has made no complaints about the three attorneys who represented him at the time he entered his plea. He focuses his complaint on Attorney Johnson, who withdrew from representation about eleven months before the plea was entered but after she counseled Petitioner during the time he made statements to investigators. The Court in Hill v. Lockhart gave as examples of challenges assessed under its holding the failure of counsel to investigate or discover potentially exculpatory evidence, which causes the defendant to plead guilty rather than go to trial. Hill, 106 S.Ct. at 370. Attorney Johnson's alleged poor performance seems to fall in line with those kinds of claims, so the Hill prejudice standard applies even though the focus of the argument is not on the actual decision to plead guilty. Thus, Attorney Johnson's alleged error prejudiced Petitioner if it caused him to plead guilty rather than go to trial. The assessment of this issue depends in large part on a prediction whether different actions by Johnson likely would have changed the outcome of a trial. Id.

An ineffective assistance claim fails if either the performance or prejudice prong are not established. Strickland, 104 S.Ct. at 2069. Petitioner's claim fails at the performance prong, so the prejudice prong need not be resolved. The undersigned will nonetheless briefly discuss facts relevant to the prejudice issue for the benefit of any reviewing court that may wish to focus on or explore that prong.

The police did not have a body or proof that a murder had been committed until Petitioner gave them the location of the body, but there was testimony presented at a hearing

to indicate some likelihood that police would have eventually discovered the body. Deputy Tracy Scott testified that the body was found only about 60 feet from Highway 1, between the highway and adjacent railroad tracks. The body was not visible from the highway, but clothing was visible from a nearby side road that led to the tracks. Tr. 394-99.

Jimmy Adams, who was employed with a railroad maintenance service, testified that his 10 to 12 man crew was working in the area when the body was recovered. They were scheduled to eventually replace the crossing near where the body was found. When they did work on that crossing, the men "were all over that area." Adams believed that someone with his crew would have walked up on the body. Tr. 399-409.

Edgar Cason, who owned the property where the body was found, once employed Petitioner to plant timber in that area. Cason testified that he usually visited the property once or twice a year, including a visit late in the year after hunting season ended, to check the timber. He said he would have walked by the place where the body was found and would have inspected if he had seen the clothing or other evidence. Tr. 409-16.

If the body would have been discovered absent Petitioner's statement to Detective Hall, that would have garnered the prosecution a body, a .25 caliber bullet, and (later) a .25 caliber Colt pistol that was found along the nearby Highway 1. A firearms expert is said to have opined that the bullet found in the victim was fired by either a Colt or Astra pistol. There is no suggestion by the parties that the expert was able to link the recovered bullet to the particular pistol that was found. The two friends who were with Wendi when Petitioner

showed them his pistol would have been able to identify the pistol as Petitioner's, as they did. The prosecution may have had other evidence not revealed by the record, but the guilty plea did away with the need for a trial, and Louisiana law did not require the establishment of a factual basis, so the full extent of evidence held by the prosecution was not presented on the record. These are the principle facts revealed by the current record that would be relevant to a prejudice analysis, but this court need not perform that analysis.

**F. Appellate Counsel**

Petitioner makes a related claim that his appellate counsel was ineffective for not briefing a claim that Attorney Johnson was not qualified to try a capital murder case. When a petitioner claims that appellate counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal. Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

It is highly unlikely that Petitioner's guilty plea would have been set aside on direct appeal because of an assertion that a trial counsel, who was replaced several months before the plea was entered, lacked the experience to try a capital case. Louisiana appellate courts follow the rule that ineffective assistance claims are generally not entertained on direct appeal, as they are more suited to resolution in a post-conviction application. See State v. Ellis, 966 So.2d 139, 150 (La. App. 2d Cir. 2007). It is doubtful the argument posed by Petitioner would have been entertained on direct appeal, and it is no more than speculative

that the court, if had addressed the merits, would have set aside the guilty plea based on the general assertion that counsel, replaced by three more experienced counsel, was not qualified to try a capital case that ended in a guilty plea. That is far from showing a reasonable probability that Petitioner would have won on appeal if appellate counsel had raised the issue. Relief is not permitted with respect to this final claim.

Accordingly;

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be **dismissed with prejudice**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court.  <u>See</u> <u>Douglass</u> <u>v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 28th day of July, 2009.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE